UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STANLEY PENA,

                        Plaintiff,

        -v.-                               9:06-CV-1242
                                            (GTS/GJD)

R.N. T. DUMAS; R.N. P. COOK; LEONARDO
DISHMAN; G. JOYAL; McCLATCHIE; LARRY
SEARS; and GLENN S. GOORD,

                        Defendants.

_____

APPEARANCES:                            OF COUNSEL:

STANLEY PENA, 04-A-5889
  Plaintiff, *Pro Se*
Wallkill Correctional Facility
Box G
Wallkill, NY 12589

HON. ANDREW M. CUOMO             JAMES SEAMAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Plaintiff Stanley Pena, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his constitutional rights.  Generally, Plaintiff's Complaint alleges that Defendants violated his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution when they (1) denied him proper medical care in deliberate indifference to his serious medical needs, (2) conspired and retaliated against him, (3) issued him false misbehavior reports, (4) denied him due process at disciplinary hearings, (5) denied him his right to privacy;

and (6) subjected him to an unreasonable search and seizure.  Dkt. No. 1 (Compl.).  Currently

pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure.  Dkt. No. 35.  Plaintiff has filed a response to Defendants'

motion.  Dkt. No. 40.

## I.    APPLICABLE LEGAL STANDARD

For the sake of brevity, the Court will not repeat the well-known legal standard

governing motions for summary judgment pursuant to Fed. R. Civ. P. 56, but will refer the

parties to its decision in *Proctor v. Kelly*, 05-CV-0692, 2008 WL 5243925, at *3-4 (N.D.N.Y.

Dec. 16, 2008) (Suddaby, J.).

## II.    BACKGROUND

### A.    Defendants' Motion for Summary Judgment

On May 30, 2008, following the joinder of issue, Defendants moved for summary

judgment, seeking the dismissal of Plaintiff's Complaint in its entirety. Dkt. No. 35.  In their

motion, Defendants argue that the record fails to substantiate Plaintiff's claims that (1)

Defendant Dumas violated Plaintiff's Fourth Amendment privacy rights, (2) the misbehavior

reports violated Plaintiff's constitutional rights, (3) Defendants Dumas and Cook retaliated or

discriminated against Plaintiff, (4) Plaintiff's due process rights were violated during

disciplinary hearings, (5) Defendants Goord, Sears, and Dishman were personally involved in

any wrongdoing, (6) Defendants were deliberately indifferent to his serious medical needs, or (7)

Defendants conspired against Plaintiff.  *Id*.  Defendants also argue that they are entitled to

qualified immunity with respect to Plaintiff's Fourth Amendment claim.  *Id*.  Plaintiff responded

in opposition to Defendant's motion.  Dkt. No. 40.

**B.     Plaintiff's Failure to Comply with Local Rule 7.1(a)(3)**

Local Rule 7.1(a)(3) of the Northern District of New York provides that a motion for

summary judgment must include a Statement of Material Facts ("Rule 7.1 Statement").[1]  The

Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about

which the moving party contends there exists no genuine issue.  Each fact listed shall set forth a

specific citation to the record where the fact is established.  N.D.N.Y.L.R. 7.1(a)(3).  Once a

properly supported Rule 7.1 Statement is submitted by the moving party, Rule 7.1 requires that

the party opposing summary judgment file a response to the moving party's Rule 7.1 Statement.

*Id*.  The non-movant's response shall mirror the movant's Rule 7.1 Statement by admitting and/or

denying each of the movant's assertions in matching numbered paragraphs.  *Id*.  Each denial shall

set forth a specific citation to the record where the factual issue arises.  *Id*.  The non-movant's

response may also set forth any additional material facts that the non-movant contends are in

dispute in separately numbered paragraphs.  *Id.*

While Plaintiff has opposed Defendants' Summary Judgment Motion, he has not

responded to Defendants' Rule 7.1 Statement, as required by Local Rule 7.1(a)(3).  By its terms,

Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the

---

[1]     Rule 7.1(a)(3) also requires the moving party to advise a *pro se* litigant of the consequences of his or her failure to respond to a motion for summary judgment.  Defendants' notice of motion specifically advised Plaintiff of the requirements of Local Rule 7.1(a)(3) and the consequences of failing to respond to their Rule 7.1(a)(3) Statement.  *See* Dkt. No. 35-1.  In addition, it is worth noting that, to assist *pro se* litigants, the Clerk of the Court for the Northern District of New York has provided to all correctional facilities in New York State, including Plaintiff's correctional facilities at the time in question, copies of the Northern District's Local Rules of Practice and the Northern District's *Pro Se* Handbook.  Both of those documents contain a similar notification.  *See also* N.D.N.Y. L.R. 7.1(a)(3) [containing notice of consequences]; United States District Court for the Northern District of New York *Pro Se* Handbook, at 16, 41, http://www.nynd.uscourts.gov/documents/ProSeHandbook2008.pdf [containing notice of consequences].  Clearly, Plaintiff understood these consequences since he requested (and was granted) an extension of the response-filing deadline.  *See* Dkt. No. 37.

<u>Statement of Material Facts that the opposing party does not specifically controvert</u>." *See*

N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Courts in this district have not hesitated to

enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an

opposing party's failure to properly respond.[2] This is so even where the nonmoving party was

proceeding *pro se* in a civil rights case.[3] This is because even *pro se* litigants must obey a

---

[2]    *See N.Y. Teamsters Conference Pension & Retirement Fund v. Express Services, Inc.,* 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitting a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir. 1998) (*per curiam*) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F. Supp.2d 104, 108 (N.D.N.Y. 2000) (Kahn, J.) (deeming movant's Rule 7.1[a][3] Statement admitted where non-movant's response "failed to controvert with specificity the facts set forth" in the moving party's Rule 7.1 Statement and did not cite specifically to the record); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y. 1999) (McAvoy, C.J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F. Supp. 2d 311, 317 (N.D.N.Y. 1999) (deeming admitted all facts in defendants' Rule 7.1[a][3] statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record") (McAvoy, C.J.).

[3]    *See, e.g.*, *Hassig v. N.Y.S. Dep't of Environmental Conservation*, 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd*, No. 04-1773, 2005 WL 290210 (2d Cir. Feb. 2, 2005); *Lee*, 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd*, No. 04-1921, 2004 U.S. App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd*, No. 04-1008, 115 F. App'x 521 (2d Cir. Dec. 23, 2004); *Krug v. County of Rennselaer*, 04-CV-0640, 2006 WL 2669122, at *2-3 (N.D.N.Y. Sept. 18, 2006) (McAvoy, J.); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *2-3 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.); *Singleton v. Caron*, 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept. 5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan*, 289 F. Supp.2d at 295; *Butler v. Weissman*, 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.*, 49 F. Supp.2d 84, 86 & n.1 (N.D.N.Y. 1999) (McAvoy, C.J.); *Costello v. Norton*, 96-CV-1634, 1998 WL 743710, at *1, n.2 (N.D.N.Y. Oct. 21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.*, 96-CV-1812, 1998 WL 566773, at *1, n.2 (N.D.N.Y. Aug. 21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a][3] "to carry out the conduct of its business").

district court's procedural rules.[4]

Because Plaintiff failed to include in his opposition papers a Rule 7.1 Statement specifically controverting Defendants' factual assertions in matching numbered paragraphs with specific citations to the record, Defendants' factual assertions in their Rule 7.1 Statement are deemed admitted by Plaintiff–as long as each of Defendants' factual assertions are supported by accurate record citations.  As the Second Circuit has made clear,

> [W]here the non-moving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial....  If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then "summary judgment must be denied *even if no opposing evidentiary matter is presented*." ... [I]n determining whether the

---

[4]    *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed . . .  we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins*, 465 U.S. 168, 184 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) ("[I]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant].");  *Faretta v. California*, 422 U.S. 806, 834, n.46 (1975) ("The right of self-representation is not a license . . .  not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) ("[P]*ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995) ("Although *pro se* litigants should be afforded latitude, . . . they generally are required to inform themselves regarding procedural rules and to comply with them . . . .  This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.*, 69 F.3d 5, 8 (2d Cir. 1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, . . . *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.") [citations omitted]; *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) ("[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se*] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

> moving party has met this burden of showing the absence of a genuine
> issue for trial, the district court may not rely solely on the statement of
> undisputed facts contained in the moving party's Rule 56.1 Statement.  It
> must be satisfied that the citation to evidence in the record supports the
> assertion.

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (internal

citations omitted).

Finally, implied in the above-stated legal standard is the fact that, where a nonmoving

party fails to adequately respond to a motion for summary judgment, a district court has no duty

to perform an independent review of the record to find proof of a factual dispute–even if that

nonmoving party is proceeding *pro se*.  However, in the event that the court chooses to conduct

such an independent review of the record (which the Court declines to do in this case), any

verified complaint filed by the plaintiff should be treated as an affidavit.  That having been said,

to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit

(or verified complaint) must, among other things, be based "on personal knowledge."[5]  An

affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based

on mere "information and belief" or hearsay.[6]  In addition, such an affidavit (or verified

---

[5]    Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) (citations omitted), *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).

[6]    *See Patterson*, 375 F.3d 206, 219 (2d Cir. 2004) ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'. . . [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief . . . .  Because there is no way to ascertain which portions of

complaint) must not be conclusory.[7]  An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[8]

Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so lacking in credibility (because the testimony is incomplete and/or replete with inconsistencies and improbabilities) that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable trier of fact could find for the non-movant.[9]

---

[Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment.").

[7]    *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted];  *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[8]    *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") (citations omitted); *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

[9]    *See Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of

### C.    Statement of Undisputed Material Facts

The following facts were asserted by Defendants in their Rule 7.1 Statement, supported

by accurate record citations, and were not controverted by Plaintiff in a Rule 7.1 Response.[10]

1.    The events giving rise to this lawsuit occurred while plaintiff was being housed at Franklin Correctional Facility ("Franklin"), a medium security facility in Malone, New York, in December 2005 (Dkt No. 1 at 5-8; pp 39-40).

2.    At the time plaintiff was at Franklin he was receiving Neurontin to control his seizures from a head injury he sustained when he was 16 years of age (pp 22, 115).

3.    Plaintiff knew when a seizure was beginning, because the right side of his mouth would begin to twitch (pp 29-30). Next, his right eyelid would twitch and from there it spread down to his right arm and down to his right leg (*Id.*). Sometimes, but not always, plaintiff would become unconscious during a seizure (*Id.*).

---

which is contradictory and incomplete, it will be impossible for a district court to determine whether . . . there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account. . . .  In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, . . . we hold that the District Court did not err by awarding summary judgment.  Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, . . . conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted]; *cf. Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42-46 (2d Cir. 1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line [1] was "unsupported by documentary or other concrete evidence," and indeed was contradicted by the other record evidence, and [2] was "conclusory" and "inconsistent" with plaintiffs' present representations); *Olle v. Columbia Univ.*, 332 F. Supp.2d 599, 612-15 (S.D.N.Y. 2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony [1] recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign," and [2] were inconsistent with plaintiff's other statements and claims), *aff'd*, 136 F. App'x 383 (2d Cir. 2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

[10]    Defendants state that, unless otherwise indicated, all page citations are to plaintiff's deposition transcript and all Exhibit citations are to the May 30, 2008 Seaman affirmation.

4.      Plaintiff knew that when a seizure was beginning, he needed to get down so that he would not fall during the seizure (pp 31-32).

5.      In addition to the Neurontin and other medications, including psychiatric drugs, plaintiff was also receiving Robaxin, or Methocarbamol (pp16, 63, 115-116; Exh 3; Exh 5 at 5).

6.      According to plaintiff, one Robaxin tablet can make you feel "high" and "drunk" (Exh 5 at 6; Exh 6 at 3).

7.      On November 14, 2005, plaintiff received a prescription for Robaxin (Cook Dcl. Exh A at 3). The prescription provided for a 30-day supply, i.e., 90 pills, to be taken three times per day (*Id*.). The prescription provided for two refills (*Id*.).

8.      On December 6, 2005, a refill of the November 14th Robaxin was ordered, providing plaintiff with another 90 pills to be taken over the course of ensuing 30 days (*Id*. at 4).

9.      Plaintiff actually received the 90 Robaxin tablets the following day, December 7 (pp147-148).

10.     On the evening of December 8, 2005, plaintiff walked from his dorm to the medical unit, or infirmary, a 10-15 minute walk, to get his dose of Neurontin and some psychiatric medication from the nurse (pp 43, 114-115).

11.     After receiving his seizure and psychiatric medications, plaintiff began walking back to his dorm (p 114).  He had walked only about 2-3 minutes when he went to light a cigarette and just fainted and hit the ground (pp 44, 48).  This was not a seizure; he just fell (pp 112-114; Exh 10).

12.     According to plaintiff, two inmates and a Correction Officer observed him fall, but he cannot identify any of them (pp 45-49).

13.     One of the inmates woke plaintiff up and said that plaintiff just hit the ground (p45). The two inmates carried him back to the infirmary (p 48).

14.     When plaintiff arrived at the infirmary, Defendant Dumas, a Registered Nurse who works there, said he appeared drunk, which plaintiff denied (pp 51-52).

15.     She said that if plaintiff did not give her blood and urine samples, she would have him sent to the "box", meaning the special housing unit ("SHU") (pp 52, 54).

16.     In response, plaintiff did not say anything, he just let her draw a blood sample and he provided a urine sample (pp 57-58).

17.    Right after that, Dumas and an unidentified Officer escorted him to the telemed room where plaintiff was seen via teleconference by a medical practitioner at the Erie County Medical Center ("ECMC") (pp 58-59, Exh 3; Cook Dcl Exh A at 5, 15).

18.    It is plaintiff's understanding that the medical practitioner from ECMC was Defendant Dishman (pp 60, 64-66).

19.    However, that cannot be, because Dr. Dishman is a pathologist and the Director of the Laboratory at Alice Hyde Medical Center in Malone, New York (Dishman Dcl. ¶1: Exh 4 at 14).

20.    According to plaintiff, RN Dumas reported to the telemed practitioner that plaintiff had taken 10 Robaxin pills (p 63; Exh 3).

21.    Plaintiff's medical record indicates that he admitted having taken them at that time (Cook Dcl Exh A at 5, 12).

22.    Plaintiff does not dispute that 10 pills were missing (pp 148-149).

23.    At his deposition in March, 2008, however, plaintiff testified that the ten pills were missing because:
    (a) he gave all 10 pills to another inmate (p 149);
    (b) he gave 1 pill to another inmate (*Id.*);
    (c) he gave 5 pills to another inmate and he took 2 or 3 (pp 149-150); and
    (d) he gave 5 pills to another inmate and probably took 5 himself (pp 150).

24.    In any event, the teleconference with ECMC lasted from 10:10 p.m. until 10:20 p.m. (p 62. Exh 3; Cook Dcl Exh A at 15).

25.    After the conference ended Dumas admitted plaintiff to the infirmary for observation and he stayed there for the night (pp 67-68).

26.    According to plaintiff, when he was released the following day, Friday, December 9, 2005, he was placed on keeplock (pp 68-72).

27.    On December 9, 2005, Plaintiff had a supply of 80 Robaxin (Cook Dcl Exh A at 7).

28.    On or about December 12, 2005, RN Cook received the results of plaintiff's blood sample drawn on December 8, 2005 and reported the results to Defendant McClatchie (Exh 4 at 11).

29.    The lab which did the analysis was the Alice Hyde Medical Center Lab in

10

Malone, New York (Exh 4 at 14), where Defendant Dishman is the director (*Id.*).

30.    On December 12, 2005, Sergeant McClatchie issued a misbehavior report (also referred to in these motion papers as Ticket #1), charging plaintiff with having violated prison rule 113.13, being under the influence of an intoxicant (Exh 4 at 11). Attached to this December 12 ticket was a copy of the lab report showing plaintiff's blood alcohol content as 8.4 miligrams per deciliter, with the upper limit of normal for that lab analysis being 5.0 mg/dL (pp 98-100, Exh 4 at 14).

31.    Plaintiff received a copy of Ticket #1 on December 13, 2005 (p 153, Exh 4 at 11, 12. Exh 5 at 2, Exh 12).

32.    On December 14, 2005, Dumas asked officers at plaintiff's dorm to check the amount of plaintiff's remaining medications, and learned that only 5 Robaxin remained from the 80 pills he had just five days earlier on December 9th (Cook Dcl Exh A at 7). If taken as prescribed, i.e., three tablets per day, the supply should only have been depleted by 15 pills, not 75 (*Id.* at 3).

33.    Dumas had plaintiff come to the medical unit (p 117; Cook Dcl Exh A at 7). Once there, she discussed his taking 70-plus Robaxin tablets, which plaintiff referred to as his "medical condition," in the presence of some unknown Correction Officer (pp 117-118). Plaintiff does not know the identity of the Officer or of anyone this Officer may have told about this discussion (p 118-119).

34.    Duma[s] told plaintiff that he appeared drunk again (pp 84-85).

35.    Dumas again told plaintiff that if he did not provide blood and urine samples, she would send him to SHU, so he allowed her to draw the blood sample and provided the urine sample (pp 84-86, 120).

36.    She kept him overnight in the infirmary again, as she had done on the 8th of December, and in the morning of December 15th, plaintiff was taken to the Franklin SHU (pp 85- 86).

37.    Dumas issued a disciplinary ticket on December 15, 2005 (also referred to in these motion papers as Ticket #2), charging plaintiff with violating two prison rules: 113.24, failing to use medication as directed; and 116.10, misuse of medication (Exh 4 at 22).

38.    The hearing to adjudicate Ticket #1 (by Sgt. McClatchie), based on the Alice Hyde lab report, was conducted by Deputy Superintendent Habeck, who is not a party to this lawsuit (pp 152-53, 159-60, Exh 5). The hearing commenced on December 19, 2005 at 12:35 p.m. (Exh 5 at 1-2).

39.    At the time plaintiff received a copy of Ticket #1 on the morning of December 13, 2005, he waived his right to an assistant in writing (Exh 12).  He also waived his right to an assistant, again, at the hearing (Exh 5 at 2).

40.    Dep. Habeck did not prevent plaintiff from presenting any evidence at the hearing (pp 156-58).

41.    During the hearing, plaintiff testified that Robaxin made him feel "high" like he was "drunk" (Exh 5 at 6). Later, he testified that when he was taken to the medical unit after having fallen on December 8 , he admitted to th medical staff that he had taken 10-15 Robaxin (Exh. 5 at 9; Exh 11; Cook Dcl Exh A at 5, 12).

42.    Hearing Officer Habeck found plaintiff guilty and imposed two months SHU confinement along with two months loss of various privileges, among other things (Exh 5 at 10).

43.    However, Hearing Officer Habeck delayed the imposition of these disciplinary measures until January 7, 2006 (Exh 4 at 12).

44.    Just before the hearing ended at 1:12 p.m on December 19, 2005, Hearing Officer Habeck provided plaintiff with a completed copy of the Disposition Rendered form from that hearing which contained his findings and the basis for his findings (Exh 4 at 12).

45.    Ten minutes later, the hearing to adjudicate Ticket #2 (written by Defendant Dumas on December 15 [Exh 4 at 22]) commenced before Education Supervisor George Joyal, one of the defendants herein (Exh 6).

46.    Plaintiff had received a copy of Ticket #2 three days earlier, on the morning of December 16, 2005, and waived his right to an assistant, in writing, at that time (pp 105-106, Exh 7).

47.    At the outset of the Joyal hearing, plaintiff confirmed that he had received a copy of the charges and had waived his right to an assistant (Exh 6 at 2).

48.    Plaintiff had no objection to the way in which Hearing Officer Joyal conducted the hearing (Exh 6 at 10).

49.    Plaintiff has denied ingesting the 70 or so Robaxin pills that RN Dumas found were missing on December 14th, but does not dispute they were missing (pp 163-164).

50.    It was plaintiff's contention that someone stole them out of his locker when he hurriedly left for the medical unit one time without locking the locker (pp 73-80; Exh 6 at 4-5).

51.     Plaintiff also told Hearing Officer Joyal that he knew he was supposed to take only one Robaxin at a time (Exh 6 at 5).

52.     Plaintiff also admitted to Joyal that on one occasion he did take more than one at a time (Exh 6 at 3). According to plaintiff, that was on December 8 when he fell and was charged with having been intoxicated (which formed the subject matter of Ticket #1 by Sgt. McClatchie) (Exh 6 at 6, 8, 9-10). Plaintiff said at that time he took as many as 15 Robaxin at one time (Exh 6 at 6).

53.     Hearing Officer Joyal found plaintiff guilty and imposed two months of SHU confinement and loss of various privileges to begin on March 7, 2006 (Exh 4 at 23, Exh 6 at 10).

54.     At the close of this second hearing, Joyal gave plaintiff a copy of the Hearing Disposition Rendered form which cited the reasons underlying the guilty finding (Exh 4 at 24).

55.     Just four days later, however, upon discretionary review conducted December 23, 2005, the superintendent reversed the Joyal disposition (pp173-174, Exh 9).

56.     As a result, plaintiff never served any SHU time, nor suffered any other disciplinary measure, arising from the charges in Ticket #2 issued by RN Dumas, which was adjudicated at the Joyal hearing (*Id*.).

57.     On or about January 6, 2006, plaintiff appealed Deputy Superintendent Habeck's disposition of Ticket #1 by Sgt. McClatchie (Exh. 15). Plaintiff thought his appeal might have gone to Commissioner Goord (pp 168-170).

58.     As it turns out, the appeal was decided by non-party Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, who reversed the Habeck disposition on February 24, 2006 (Exh 14).

59.     By that time, plaintiff had been released from SHU; according to plaintiff, he remained in SHU until February 6, 2006 (pp 123-124).

60.     The record in this case indicates that plaintiff did not begin serving time on Ticket #1 until January 7, 2006 (Exh 4 at 12). Thus, only the last 30 days plaintiff was in SHU, 1/7/06-2/6/06, are attributable to any matter arising from this lawsuit (*Id*.).

61.     Plaintiff spent the first two weeks, from December 15 until about December 29, 2005, in the SHU at Franklin (p 124). The rest of the time he was in the SHU at Green Correctional Facility ("Green") (pp 124-26). Thus, all of plaintiff's SHU time pertinent to this case was spent at Green (*Id*.).

13

62.    While plaintiff was in the SHU, he was allowed to shower and exercise (p 129). He did not bother anyone, and no one bothered him (pp 129-131).

**D.    Allegations of Plaintiff's Complaint**

To the extent that the allegations of Plaintiff's Complaint are different from the undisputed material facts of the case as set forth above in Part II.C. of this Decision and Order, those allegations, construed with extraordinary liberality,[11] are as follows.

Plaintiff has a medical condition that "prevents [him] from staying out in the cold [in]clement weather without becoming dizzy and falling into unconsciousness." Compl. at 5. Despite this condition, the "medical department under the care of DOCS and the superintendent of FCF [Franklin Correctional Facility] did not make the necessary provisions to have [Plaintiff] housed in a medical unit close to the hospital." Compl. at 5. Plaintiff complained to the medical department "about being moved to the special medical unit for inmates who fall" so that he would not have to walk outside in the cold to receive his medications. Compl. at 6. However, Plaintiff was required to walk approximately 10 to 15 minutes per day, three times a day, from his housing unit in the annex area of Franklin to the medical unit to receive his medications. Compl. at 6. On December 8, 2005, while Plaintiff was returning from the medical unit, "[i]t was very cold outside and snowing, the wind was blowing extremely hard." Compl. at 5. Approximately 100 feet from the medical unit, Plaintiff "caught a seizure from the clement [*sic*] weather and fell unconscious to the ground." Subsequently, Plaintiff did not "know what happened [because he] blanked out." Compl. at 6.

---

[11]    Generally, the pleadings of *pro se* litigants are construed with even more liberality than is required under Fed. R. Civ. P. 8(e). *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000).

14

Defendant Dumas issued him a misbehavior report on December 15, 2005, stating that Plaintiff "got away the first time, but [Dumas has] caught [Plaintiff] this time."  Compl. at 6. Defendants Commissioner Goord and Superintendent Sears were responsible for hiring Defendants Dumas and Cook.  Compl. at 7.

Defendant Sears assigned hearing officers to conduct the two disciplinary hearings regarding Plaintiff's December 12 (Ticket # 1) and December 15 (Ticket # 2) misbehavior reports. Compl. at 6.  Plaintiff was (allegedly) denied due process at both hearings.  Compl. at 6. When he filed this action, Plaintiff did not know the identity of the first hearing officer, a John Doe.[12]  Compl. at 7.  The John Doe hearing officer "failed to investigate plaintiff's statement regarding his medical condition" and placed Plaintiff in SHU "based upon fraudulent evidence and false testimony, created by defendant's [*sic*] as a conspiracy to entrap plaintiff."  Compl. at 7.  Defendant Joyal, who conducted Plaintiff's second disciplinary hearing, denied Plaintiff an assistant and the right to present evidence.  Compl. at 7.  In addition, Defendant Joyle (allegedly) "used false information and fraudulent records that were manufactured by defendant's and conspired by all defendants to punish plaintiff."  Compl. at 7.  Finally, Defendants failed "to follow their own rules" requiring "appropriate authorization" before they took his blood and urine.  Compl. at 8.

## III.    DISCUSSION

### A.    Claims of False Misbehavior Reports

"[A] prison inmate has no general constitutional right to be free from being falsely

---

[12]    Plaintiff has still not named a "John Doe" defendant in this action.  *See* Compl. at 1-3, Parties.

accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) [citation omitted]; *see also Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986) ("Prison inmate[s] ha[ve] no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.").  The Constitution only guarantees that prison inmates will "not ... be deprived of a protected liberty interest without due process of law." *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (quoting *Freeman*, 808 F.2d at 951).  As long as prison officials grant the inmate a hearing and an opportunity to be heard, the "filing of unfounded charges d[oes] not give rise to a per se constitutional violation actionable under section 1983." *Franco*, 854 F.2d at 587 (quoting *Freeman*, 808 F.2d at 953).  Thus, the mere allegation that a defendant filed false disciplinary charges against an inmate is insufficient to state a claim for the violation of the inmates rights.

In this case, Plaintiff alleges that Defendants McClatchie and Dumas filed false misbehavior reports against him.  Plaintiff alleges that McClatchie's report was based upon false information provided by Defendant Cook.  Plaintiff was afforded a hearing and an opportunity to be heard with respect to each misbehavior report.  Plaintiff's false misbehavior report claims are therefore dismissed for failure to state a claim upon which relief may be granted.[13]

### B.    Claim of Violation of Right to Privacy

The Due Process Clause of the Fourteenth Amendment provides protection from the unwanted disclosure of health-related information.  *Doe v. City of New York*, 15 F.3d 264, 267

---

[13]    An inmate may, however, state a claim concerning a false misbehavior report if he alleges that the report was issued as retaliation against the prisoner for exercising a constitutional right.  *Boddie* (citing *Franco*, 854 F.2d at 588-90).  Plaintiff's claims of retaliation are discussed separately, below, in Part V.D.

(2d Cir. 1994); *see also Whalen v. Roe*, 429 U.S. 589, 598-99 (1977) (a right of privacy is

implicit in the Fourteenth Amendment's protection of personal liberty, and such right includes

the "individual interest in avoiding disclosure of personal matters").  Prison officials may

impinge upon that right only to the extent that their actions are "reasonably related to legitimate

penological interests."  *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999).  A prisoner's

interest in keeping a particular medical condition private varies with the condition.  *Powell,* 175

F.3d at 111 (citing *Doe,* 15 F.3d at 267); *see also Rodriguez v. Ames*, 287 F. Supp. 2d 213, 220

(W.D.N.Y. 2003).  This limited right to privacy applies in the case of an inmate who suffers from

a medical condition which, if disclosed unnecessarily, would likely expose the inmate to ridicule,

discrimination, or even potential violence, particularly when word of the condition is likely to

spread through "humor or gossip."  *Powell*, 175 F.3d at 112; *Rodriguez*, 287 F. Supp. 2d at 220;

*see also Leon v. Johnson*, 96 F. Supp. 2d 244, 252 (W.D.N.Y. 2000).

Plaintiff claims that on December 14, 2005, Defendant Dumas "disclos[ed Plaintiff's]

medical condition and information without [Plaintiff's] consent" in the presence of an unknown

correctional officer.  Compl. at 6.  At his deposition, Plaintiff testified that he did not know the

name of the correctional officer.  Dkt. No. 35-3, Deposition Transcript at 117-19.  When asked

what medical condition was discussed in front of the correctional officer, Plaintiff testified that

Dumas discussed Plaintiff's "gunshot wound" and that Plaintiff had taken too much Robaxin.

*Id.*; *see also* Def. Rule 7.1 Statement at ¶ 33.  Plaintiff also testified that as far as he knew,

neither Defendant Dumas nor the correctional officer shared the information with anyone else,

and Dumas did not tell any other inmate.  *Id*.  Additionally, Plaintiff stated that the correctional

officer "don't care about it.  He just watching me, that's what he was doing."  *Id*.

The Court finds that Plaintiff's confidentiality claim lacks the necessary elements required to establish a breach of medical privacy claim.  Neither Plaintiff's Complaint nor the record currently before this Court discloses any basis to conclude that deeply personal, confidential, or sensitive information regarding Plaintiff was potentially disclosed by Defendant Dumas to others within the facility.  Thus, the limited due process right to privacy does not apply.  In addition, even if the Court could find that Dumas infringed upon Plaintiff's medical privacy rights when she spoke of Plaintiff's medical issues in front of a correctional officer, asking that a correctional officer be present when Dumas spoke to Plaintiff served a legitimate penological purpose (i.e., ensuring facility safety and security), because Plaintiff's behavior at the time would lead to a reasonable suspicion that Plaintiff was drunk.

As a result, Plaintiff's Fourteenth Amendment medical privacy claim is dismissed.

## C.    Claims Under the Fourth Amendment

"The Fourth Amendment requires government to respect '[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures.'"  *Chandler v. Miller,* 520 U.S. 305, 308 (1997).  Government may generally not "undertak[e] a search and seizure absent individualized suspicion."  *Id*.

Blood testing and urinalysis testing both constitute a search subject to the Fourth Amendment.  *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602 (1989); *Harris v. Keane,* 962 F. Supp. 397, 407 (S.D.N.Y. 1997).  However, if the intrusion into one's privacy is found to be minimal, the expectation of privacy is minimal, and there is a governmental reason advanced supporting a search, then the search will not violate one's Fourth Amendment rights.  *Harris,* 962 F. Supp. at 407.

It is well-established that a prisoner's right to be free from unreasonable searches is diminished once he or she steps through the prison door. *Bell v. Wolfish,* 441 U.S. 520, 557 (1979). The Supreme Court has concluded that "the intrusion occasioned by a blood test is not significant, since such 'tests are ... commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.'" *Skinner*, 489 U.S. at 625 (citing *Schmerber v. California*, 384 U.S. 757, 771 [1966]). In *Schmerber,* the Supreme Court recognized "society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity." *Skinner*, 489 U.S. at 625 (citing *Winston v. Lee*, 470 U.S. 753, 762 [1985]). Urinalysis testing has also been found to be a minimal intrusion into one's privacy. *Harris*, 962 F. Supp. at 407.

The record establishes that on the evening of December 8, 2005, Plaintiff left the medical unit and "just fainted and hit the ground." Def. Rule 7.1 Statement at ¶ 11; Dkt. No. 35-3, Dep. Tr. at 44. Plaintiff was placed under twenty-four-hour observation after the fall; his medical records indicate that, during that observation period, his manner and speech were inappropriate and that he admitted to having taken 10 Robaxin tablets. Dkt. No. 35-20 at 5, 11, 12; *see also* Dkt. No. 35-8, Hearing Transcript # 1 at 9. At his disciplinary hearing for Ticket # 1, Plaintiff testified that taking too much Roboxin made him feel high or drunk, and that he felt drunk on December 8, 2005, the day that he fell. Dkt. No. 35-8, Hearing Transcript # 1 at 6-9. At his disciplinary hearing for Ticket # 2, Plaintiff also testified that on December 8, 2005, he took too many pills and appeared to be drunk. Dkt. No. 35-9, Hearing Transcript # 2 at 9. Plaintiff's medical records indicate that on December 14, 2005–the second time that Plaintiff was required

to give blood and urine–Plaintiff had used or otherwise lost 75 Roboxin tablets in a period of five days.[14]  Dkt. No. 35-20 at 7.  The medical records also indicate that, on that date, Plaintiff exhibited "slurred speech."  *Id.*  In addition, Plaintiff testified at his deposition that when Defendant Dumas drew his blood, "[i]t didn't injure [him], it was just too deep."  Dkt. No. 35-3, Dep. Tr. at 121.  Plaintiff further testified that, other than the pinprick, he was not hurt by the blood draws.  *Id.* at 122-23.

Plaintiff's appearance and mannerisms on both December 8 and 14, 2005, coupled with his fall, his admission that he took more than the prescribed number of Robaxin tablets, and the missing Robaxin tablets, provided reasonable suspicion that Plaintiff was intoxicated or otherwise under the influence.  Under the circumstances, the taking of Plaintiff's blood and urine was reasonable and constituted a minimal invasion of Plaintiff's privacy rights, especially in light of Plaintiff's incarceration.

Plaintiff also claims that Defendant Dumas failed to follow DOCS regulations when she took Plaintiff's blood and urine.  Plaintiff claims that procedures set forth in DOCS regulations were "circumvented by defendant's and not followed."  Dkt. No. 40 at 19; *see also id.* at Ex. C.[15]

---

[14]    On December 9, 2005, Plaintiff received 80 Robaxin tablets.  On December 14, 2005, he had only 5 left.  Dkt. No. 35-20 at 7.  If taken as prescribed (i.e., three tablets per day), Plaintiff should have used only 15 tablets, not 75 tablets.  Def. Rule 7.1 Statement at ¶ 32; Dkt. No. 35-9, Cook Decl., Ex. A at 3, 7.

[15]    Plaintiff's Exhibit C is a copy of N.Y. Comp. Codes R. & Regs., Title 7, Part 1020 (Urinalysis Testing).  Pursuant to New York Regulations, as long as the urine testing is not done with an intent to harass, a member of the corrections staff may order an inmate to submit to urine testing "[w]hen correctional staff has reason to believe the inmate has used drugs ..., when correctional staff receives information from a source that the inmate is currently under the influence of or has recently used ... drugs ..., [or] as part of a computer-generated program for random testing of all inmates [or those] inmates who have been found guilty of drug ... related misconduct in the previous two-year period."  N.Y. Comp. Codes R. & Regs. tit. 7, § 1020.4(a)

Plaintiff also claims, without any evidentiary support, that Defendant Dumas was required to obtain the consent of a supervisor before she drew Plaintiff's blood.  Dkt. No. 35-3, Dep. Tr. at 54 and 122.

Even assuming, for purposes of this motion, that Defendant Dumas failed to follow DOCS regulations, the failure to follow a DOCS Directive or prison regulation does not give rise to a federal constitutional claim.  *Hyman v. Holder*, 96-CV-7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001).  Similarly, violations of state law procedural requirements do not alone constitute a deprivation of due process since "[f]ederal constitutional standards rather than state law define the requirements of procedural due process."  *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990).  While Plaintiff's allegations that Defendants failed to follow state rules and regulations may give rise to state law claims, they do not, by themselves, constitute due process violations of a constitutional nature.  *See Hyman*, 2001 WL 262665, at *6 ("Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles.") (citing *Doe v. Connecticut Dept. of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990) [other citations omitted]).

Based on the foregoing, Plaintiff's Fourth Amendment claims are dismissed in their entirety.

### D.    Claim of Retaliation

In order to establish a claim of retaliation for the exercise of a constitutional right, a

---

(1), (4), (7), (8); *see also Rodriguez v. Coughlin,* 795 F. Supp. 609, 610, 611, 613 (W.D.N.Y.1992) (holding that two random drug tests within a twelve-month period, both producing negative results, did not constitute a constitutional violation).

plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for ***adverse action*** taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 [2d Cir. 1997]). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, a plaintiff must set forth non-conclusory allegations. *Bennett*, 343 F.3d at 137 (citing *Dawes v. Walker*, 239 F.3d 489, 491 [2d Cir. 2001], *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 [2002]). Finally, even if a plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett*, 343 F.3d at 137.

The Second Circuit has defined "adverse action" as "'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 [2d Cir. 2003], *superseded by Davis v. Goord*, 01-0116, 2003 WL 360053 [2d Cir. Feb. 10, 2003]). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

Plaintiff alleges that on February 15, 2005, Defendant Dumas falsely accused him of being drunk and issued him Ticket # 2, while at the same time stating "you got away the first time, but I have caught you this time." Compl. at 6. Plaintiff alleges that "[t]his defendant has demonstrated that she was using her official capacity to retaliate against [Plaintiff and] to have [Plaintiff] placed in SHU without due process." Compl. at 6. He further alleges that Defendant Dumas issued Ticket # 2 as "direct retaliation against plaintiff for defendant's first attempt when

accusing plaintiff of being drunk." Compl. at 8.

Plaintiff fails to allege that he engaged in any constitutionally protected conduct that precipitated Defendant Dumas' actions or that the alleged actions taken by Defendant Dumas were the result of any such conduct. Instead, it appears that Plaintiff uses the term "retaliatory" in the context that the Defendant Dumas took actions against Plaintiff because she was angry with him. At best, Plaintiff's allegations constitute harassment, which is not actionable in a civil rights action. *See, e.g., Hendricks v. Boltja*, 20 Fed. Appx. 34, 36 (2d Cir. 2001) (holding that "verbal harassment was not actionable" in case where officer, *inter alia*, told inmate to "get [his] black ass out of the library" and threatened to "smash [his] head open"); *Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995) (McAvoy, C.J.) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beckles v. Bennett*, 05-CV-2000, 2008 WL 821827, at *23 (S.D.N.Y. Mar. 26, 2008) (alleged threatening remarks that Plaintiff was "getting no rec, only [defendant's] foot up [plaintiff's] behind" was insufficient to state § 1983 claim).

Because the Court finds that no reasonable fact-finder could conclude in Plaintiff's favor with respect to his retaliation claims, the retaliation claims are dismissed in their entirety.

### E.    Claims of Conspiracy

To demonstrate the existence of a conspiracy under 42 U.S.C. § 1983, a plaintiff must show that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002); *Pangburn v. Culbertson*, 200 F.3d 65, 72 [2d Cir. 1999]). Plaintiff must submit evidentiary proof in

admissible form establishing an agreement between the parties. *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir. 1992); *see also Whitfield v. Forest Elec. Corp.,* 772 F. Supp. 1350, 1353 (S.D.N.Y. 1991) (plaintiff must put forth facts demonstrating an agreement among two or more persons). Conclusory, vague or general allegations of conspiracy, cannot withstand a summary judgment motion. *Dawes v. Kelly*, 01-CV-6276, 2005 WL 2245688, at *6 (W.D.N.Y. Sep. 14, 2005) (citing *Sommer,* 709 F.2d at 175; *Leon v. Murphy,* 988 F.2d 303, 311 [2d Cir. 1993]). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363-64 (S.D.N.Y. 2000) (citing *Malsh v. Austin,* 901 F. Supp. 757, 765 [S.D.N.Y. 1995]). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

Plaintiff's allegations of conspiracy are wholly conclusory and not supported by any evidence whatsoever. Plaintiff has failed to support his conspiracy allegations with evidence from which the Court could infer a conspiracy. The record does not show that an agreement existed between any of the Defendants to deprive Plaintiff of his rights. Further, Plaintiff's mere conclusory allegations that Defendants conspired with each other to deny Plaintiff his rights are insufficient to withstand summary judgment.

In addition, to the extent that Plaintiff alleges that DOCS employees conspired with each other, his claims fail as barred by the "intra-corporate conspiracy" doctrine (which is also sometimes referred to as the "intraenterprise conspiracy" doctrine or the "intra-agency conspiracy" doctrine). Generally, that doctrine provides that officers, agents or employees of a single entity are legally incapable of conspiring together. *Everson v. New York City Transit*

*Auth.*, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002) [citation omitted].  Because the Court has found seven district court cases from within this Circuit in which the intracorporate conspiracy doctrine has been applied with regard to conspiracy claims against the State, and only one district court case in which it has not been so applied, the Court finds that the intracorporate conspiracy doctrine does apply to cases in which the entity is the State.[16]

### F.    Claims of Deliberate Indifference to a Serious Medical Need

To state a claim for an Eighth Amendment violation based upon the denial of medical care, a plaintiff must establish that prison officials were "deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).  Specifically, a prisoner must show both that (1) under an objective standard the alleged deprivation is "sufficiently serious" in the sense that "a condition of urgency, one that may produce death, degeneration, or extreme pain" exists, and (2) under a subjective standard, the prison official "knows of and disregards an excessive risk to inmate health or safety."  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) [quotation marks and citations omitted].

---

[16]    *See Farid v. Bouey*, 554 F. Supp.2d 301, 324 (N.D.N.Y. 2008) (Sharpe, J.); *Lewis v. Goord*, 06-CV-0504, 2008 WL 902179, at *4 (N.D.N.Y. March 31, 2008) (Scullin, J., adopting, on *de novo* review, report-recommendation by Treece, M.J.); *Ozuno v. Vadlamudi*, 03-CV-0475, 2006 WL 1977618, at *10, n.7 (N.D.N.Y. July 11, 2006) (Sharpe, J., adopting, on *de novo* review, report-recommendation by Peebles, M.J.); *Colon v. Sawyer*, 03-CV-1018, 2006 WL 721763, at *6, n.8 (N.D.N.Y. March 20, 2006) (Kahn, J.); *Orafan v. Goord*, 411 F. Supp.2d 162, 164-65 (N.D.N.Y. 2006) (Magnuson, V.J.); *Scott v. Goord*, 01-CV-0847, 2004 WL 2403853, at *13 (S.D.N.Y. Oct. 27, 2004); *Cates v. State of Conn. DOCS*, 98-CV-2232, 2000 WL 502622, at *8 (D. Conn. Apr. 13, 2000); *but see Fox v. Brown*, 05-CV-1292, 2007 WL 586724, at *12 (N.D.N.Y. Feb. 21, 2007) (Kahn, J., adopting, on *de novo* review, report-recommendation of Di Bianco, M.J.); *see also Cusamano v. Sobek*, 06-CV-0623, 2009 WL 211155, at *29 (N.D.N.Y. Jan. 29, 2009) (Suddaby, J., adopting on *de novo* review report-recommendation of Lowe, M.J.).

Unless both components are satisfied, a prisoner's claim must be dismissed.

The objective component requires the medical condition be sufficiently serious. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical condition is deemed "sufficiently serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999) (citation omitted). The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment. *Id*. Thus, where "unnecessary and wanton infliction of pain" results or where the denial of medical treatment causes an inmate to suffer a life-long handicap or permanent loss, the medical need is objectively serious. *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000). The term "sufficiently serious" has also been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

As to the subjective component, plaintiff must show that the officials accused of the deprivation acted with the requisite culpable mental state. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *Hathaway*, 37 F.3d at 66. A prison official has sufficient culpable mental state if (1) he or she had actual or constructive knowledge that an inmate faced a substantial risk of serious harm, and (2) he or she ignored or disregarded that risk, (3) by failing to take reasonable steps to abate the harm, with such lapse constituting more than mere negligence. *Farmer*, 511 U.S. at 838; *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).

The gravamen of Plaintiff's Eighth Amendment deliberate indifference claim is that Defendants, knowing that Plaintiff risked seizures if he was exposed to inclement weather, failed to house Plaintiff closer to the medical unit to minimize the time he spent outside exposed to

26

cold temperatures.  The Court will assume, for the purpose of this motion, that, in light of

Plaintiff's medical history and the number of medications that he is taking, that Plaintiff may

suffer from a serious medical condition.  That being said, the Court finds that Defendants were

not deliberately indifferent to Plaintiff's medical needs.

Plaintiff has provided no admissible record evidence that any of the Defendants were

aware that his walking outside in inclement weather presented a danger to his health, let alone

that they disregarded any risk to Plaintiff's health.  In support of his claim that Defendants were

aware of his condition, Plaintiff provides only his own conclusory statement that he "suffers

'from unexpected, sudden seizures' which come and go, he was also told by his doctors when he

was not incarcerated, not to be in inclimate [*sic*] weather which might trigger an unexpected

seizure." Dkt. No. 40 at 2.  The medical records before the Court make no mention of the fact

that Plaintiff suffers from any condition which requires him to avoid inclement weather.  Dkt.

No. 35-20.  Additionally, there is no evidence to suggest that ***any*** of the Defendants were told, as

Plaintiff suggests, that he should avoid cold or inclement weather.  Plaintiff merely alleges that

he had "complained to the medical department about being moved to the special housing unit for

inmates who fall under conditions that require adequate medical review." Compl. at 6.  Plaintiff

does not indicate who at the medical department he complained to or when the complaints were

made.  Finally, there is nothing on the record to establish that Defendants Cook, Dumas,

McClatchie, or Joyal had any authority over inmate cell assignments, so it cannot be said that

they placed Plaintiff at risk.

Moreover, based on the record before the Court, Plaintiff fell on December 8, 2005,

because he took excessive amounts of his prescribed medication and not because he was exposed

to inclement weather.  The medical records and Plaintiff's testimony do not comport with

Plaintiff's description of the typical events surrounding a seizure.  Plaintiff indicates that he has

a number of warning signs before the onset of a seizure, including twitching of his mouth,

eyelids, arm, etc.  Def. Rule 7.1 Statement at ¶¶ 3-4; Dkt. No. 35-3, Dep. Tr. at 28-32.  However,

on December 8, 2005 (the day he fell), Plaintiff indicates that he went to light a cigarette and he

"just fainted and hit the ground."  Dep. Tr. at 44.  The affidavit of inmate Raines, who witnessed

Plaintiff's fall, indicates that he saw Plaintiff "suddenly just drop and lose consciousness, he

fainted as he was lighting a cigarette."  Dkt. No. 40 at 23.  In addition, there is evidence which is

undisputed by Plaintiff (except in conclusory terms), that Plaintiff took an overdose of Roboxin

on the day that he fell.  Def. Rule 7.1 Statement at ¶¶ 20-23; Dkt. No. 35-8, Hearing Transcript #

1 at 9 (Plaintiff testified that he "took that medication ... took like ten, ten or fifteen medication

and it, it got [him] high").

    As a result, Plaintiff's Eighth Amendment deliberate indifference claims are dismissed in

their entirety.

### G.    Claims of Deprivation of Due Process

#### 1.    Protected Liberty Interest

    The due process clause protects against restraints or conditions of confinement that

"exceed[] the sentence in ... an unexpected manner."  *Sandin v. Conner*, 515 U.S. 472, 484

(1995).  In order to begin a due process analysis, the court must determine that plaintiff had a

protected liberty interest in remaining free from the confinement that he challenges.  *Bedoya v.*

*Coughlin,* 91 F.3d 349, 351 (2d Cir. 1996).

    "In *Sandin*, the Supreme Court ruled that the Constitution did not require that restrictive

confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Borcsok v. Early,* 03-CV-395, 2007 WL 2454196, at *8 (N.D.N.Y. Aug. 23, 2007) (Sharpe, J.) (quoting *Sandin*, 515 U.S. at 484). Thus, a prisoner asserting that he was denied due process in connection with segregative confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

Although the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir. 1999) [citations omitted]. The Second Circuit has held that with respect to "normal" SHU confinement, fewer than 101 day confinement does not meet the standard of atypicality. *Ortiz v. McBride*, 380 F.3d 649, 654-55 (2d Cir. 2004). However, shorter periods of confinement could constitute an atypical and significant hardship if the conditions were more severe that the normal SHU conditions. *Ortiz*, 380 F.3d at 654-55. A confinement of as little as 77 days under "unusually harsh" conditions has been sufficient to raise a question of fact regarding the existence of a liberty interest. *Id*. at 655 (citing *Palmer v. Richards*, 364 F.3d 60, 66 [2d Cir. 2004]); *see also Wheeler v. Butler*, 209 Fed. Appx. 14, 16 (2d Cir. 2006) (atypicality turns on the conditions of the confinement).

In this case, as a result of his December 12, 2005, misbehavior report (Ticket # 1), Plaintiff was sentenced to two months (60 days) confinement in SHU along with two months

loss of various privileges.  Def. Rule 7.1 Statement at ¶ 53; Dkt. No. 35-7 at 12, Hearing

Disposition. There is some discrepancy in the record as to when Plaintiff began serving his

sentence.  The disposition report indicates that he was set to begin his sentence on January 7,

2006.  Def. Rule 7.1 Statement at ¶ 53; Dkt. No. 35-7 at 12, Hearing Disposition.  Defendants

assert that Plaintiff did not begin serving his sentence on Ticket # 1 until January 7, 2006; he was

released on February 6, 2006; and he thus served only 30 days in disciplinary confinement.  Def.

Rule 7.1 Statement at ¶¶ 59, 61; Dkt. No. 35-7 at 12, (Hearing Disposition); Dkt. No. 35-3, Dep.

Tr. at 123.  Plaintiff alleges that he was sent to SHU on December 15, 2005, and was released on

February 6, 2006.  Dkt. No. 35-3, Dep. Tr. at 123.  According to Plaintiff's testimony, he served

a total of 54 days in SHU as a result of Ticket # 1.[17]  *Id.*

       Plaintiff testified that, while confined in SHU, he was allowed to exercise an hour a day,

take showers, use the bathroom, read the Bible, and eat his meals.  Dkt. No. 35-3, Dep. Tr. at

129-31.  Plaintiff also stated that no one "bothered him" while he was in SHU.  *Id.*

       There is no indication on the record that Plaintiff's confinement in SHU was any more

onerous that the "normal" restrictions imposed in disciplinary or administrative segregation and

Plaintiff has not argued otherwise.  Thus, even accepting as true that Plaintiff's confinement in

SHU amounted to 54 days as suggested by Plaintiff, such confinement did not implicate a liberty

interest.

       As a result of Ticket # 2, Plaintiff was sentenced to two months in SHU.  Def. Rule 7.1

---

[17]     This factual dispute is not material unless Plaintiff can demonstrate that his short
time in SHU–between 30 and 54 days–imposed on him an atypical and significant hardship in
relation to the ordinary incidents of prison life.  The Court will, however, accept Plaintiff's
version of the facts as true for the purposes of this motion and assume that he served 54 days in
SHU.

Statement at ¶ 53; Dkt. No. 35-7 at 25.  Four days after the Ticket # 2 hearing, the disposition

was reversed on appeal.  Def. Rule 7.1 Statement at ¶ 55; Dep. Tr. at 173-74; Dkt. No. 35-12.

Since Plaintiff served no time in SHU as a result of Ticket # 2, clearly no liberty interest was

implicated.

### 2.    Process Provided

Even assuming that Plaintiff had a liberty interest in remaining free from the 54-day

confinement, Plaintiff received all the process that he was due.  "The due process protections

afforded a prison inmate do not equate to 'the full panoply of rights' due to a defendant in a

criminal prosecution."  *Sira v. Morton*,  380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v.

McDonnell,* 418 U.S. 539, 556 [1974]).  Under *Wolff*, due process requires the following: (1)

written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present

witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written

statement by the hearing officer explaining his or her decision and the reasons for the action

being taken; and (4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*,

418 U.S. at 564-67; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  Judicial

review of the written findings required by due process is limited to determining whether the

disposition is supported by "some evidence."  *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).

This standard is satisfied if "there is any evidence in the record that supports" the disciplinary

ruling.  *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000).

The record establishes that Plaintiff received written notice of the charges against him

prior to the disciplinary hearings on December 19, 2005.  Def. Rule 7.1 Statement at ¶¶ 39, 46;

Dkt. No. 35-7 at 11 (Ticket # 1); Dkt. No. 35-8 (Ticket # 2); Dkt. No. 35-8, Hearing Transcript #

1 (Plaintiff acknowledged service of Ticket # 1 on December 13, 2005); Dkt. No. 35-9, Hearing

Transcript # 2 (Plaintiff acknowledged service of Ticket # 2 on December 16, 2005). It is also

clear that Plaintiff appeared at both of his disciplinary hearings and was given the opportunity to

present witnesses and evidence and to testify on his own behalf. Def. Rule 7.1 Statement at ¶¶

40, 41, 48-52; Dkt. No. 35-8, Hearing Transcript # 1; Dkt. No. 35-9, Hearing Transcript # 2. A

review of the record also establishes that Plaintiff waived his right to inmate assistance before

each hearing (Def. Rule 7.1 Statement at ¶¶ 39, 46; Dkt. No. 35-10 at 1; Dkt. No. 35-15 at 1),

and again at both hearings (Dkt. No. 35-8, Deposition Transcript at 2; Dkt. No. 35-9, Dep. Tr. at

2). At the conclusion of each hearing, Plaintiff received a written statement from each hearing

officer explaining his decision and the reasons for the action being taken. Def. Rule 7.1

Statement at ¶¶ 44, 54; Dkt. No. 35-7 at 13 (hearing disposition by hearing officer Habeck); Dkt.

No. 35-7 at 24 (hearing disposition by hearing officer Joyal).

        The Court finds that process provided to Plaintiff meets or exceeds the minimum process

required. Therefore, even if Plaintiff's SHU confinement raised a due process claim, it does not

equate to a constitutional violation under § 1983 because Plaintiff received all of the process due.

        Having decided that the procedural due process requirements have been met, the Court

must determine whether there is some evidence which supports the decisions. *Freeman*, 808

F.2d at 954-55 (citing *Superintendent v. Hill*, 472 U.S. 445, 453-55 [1985]). "A court should not

overturn a prison disciplinary board's finding of guilt if there is any evidence to support the

board's conclusion." *Franco*, 854 F.2d at 588.

        Habeck, who is not a defendant, found Plaintiff guilty of being under the influence of

alcohol or an intoxicant based upon a laboratory report from Alice Hyde Medical Center

showing an abnormally high alcohol content in Plaintiff's blood and the testimony of Nurse

Dumas that the results in question would not be the result of any of Plaintiff's prescribed

medications. Habeck's decision was supported by some evidence. Dkt. No. 35-7 at 12-13,

hearing disposition.

Defendant Joyal found Plaintiff guilty of the charges of drug use and property damage or

loss. Dkt. No. 35-7 at 23-4, hearing disposition. Joyal indicated that he relied upon the credible

statement of Nurse Dumas in her misbehavior report that too many pills were missing from

Plaintiff's prescription bottle, as well as Plaintiff's own admissions at the hearing (1) that he

used too many pills on at least one occasion, (2) that he was aware that taking two or more pills

made him act drunk, and (3) that implied his past misuse of drugs. Thus, Joyal's decision was

supported by some evidence.

For the foregoing reasons, Defendants' motion for summary judgment is granted with

respect to Plaintiff's due process claims, and those claims are therefore dismissed in their

entirety.

### H.    Claims Against Defendants Goord and Sears

To establish liability under § 1983, a plaintiff must demonstrate that the alleged

deprivation of federal rights was committed by a person acting under "color of state law." 42

U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48-49 (1988). A prerequisite to establishing this

liability is the personal involvement of the defendants in the alleged deprivation. *Johnson v.*

*Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir. 2001); *Gaston v. Coughlin,* 249 F.3d

156, 164 (2d Cir. 2001). Generally, liability cannot be imposed on a state official for damages

under § 1983 solely by the fact that he is a supervisor because respondeat superior liability does

not exist under § 1983. *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir.1999). However, a defendant supervisor is personally involved if he or she has (1) directly participated in the infraction, (2) failed to remedy the wrong after learning of the violation, (3) created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue, or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

There is no admissible record evidence that Goord or Sears participated in any of the alleged violations of Plaintiff's rights, that they knew of but failed to act on information about such violations, or that they were grossly negligent in supervising any subordinates who committed the wrongful acts. Plaintiff's conclusory allegations that Goord and Sears hired or supervised the remaining DOCS defendants are insufficient to demonstrate personal involvement. *See Shepherd v. Goord,* 04-CV-655, 2008 WL 4283410, at *5 (N.D.N.Y. Sep. 16, 2008) (Hurd, J.) ("A position in a hierarchical chain of command, absent something more, is insufficient to support a showing of personal involvement.").

While Plaintiff claims that Goord violated Plaintiff's rights when, on appeal, he reversed the finding of guilt resulting from the issuance of Ticket # 1, this claim is untenable for two reasons. First, the record demonstrates that Donald Selsky reviewed and reversed the Ticket # 1 disposition, not Goord; Selsky's signature appears on the appeal decision, not Goord's signature. Def. Rule 7.1 Statement at ¶ 58; Dkt. No. 35-7 at 10. Moreover, even if Goord had been involved in reversing the result of the Ticket # 1 disposition (which he was not), the reversal itself cannot be found to have violated any of Plaintiff's rights, because the reversal was ***in favor of Plaintiff***, as a practical matter.

Plaintiff alleges that Defendant Sears assigned hearing officers Habeck and Joyal to conduct Plaintiff's Tier III disciplinary hearings. Compl. at 7. However, as the superintendent of Franklin, Defendant Sears was entitled to rely on his subordinates to conduct disciplinary hearings, without personally involving Sears in the conduct of the hearing. *See, e.g. See Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005); *Farid v. Goord,* 200 F. Supp.2d 220, 234-235 (W.D.N.Y. 2002) (dismissing action against DOCS commissioner and prison superintendent for lack of personal involvement where plaintiff merely sent petition to them and each referred the petition down the chain of command for investigation).

Plaintiff also claims that on February 24, 2006, Defendant Sears "dismissed" Plaintiff's first misbehavior report. Compl. at 8. Since the "dismissal" of disciplinary charges against Plaintiff was an action ***favorable to Plaintiff***, this allegation against Defendant Sears fails to establish that Plaintiff's rights were violated in any manner.

Based on the foregoing, Defendants Goord and Sears are dismissed from this action.

### I.    Claim Against Defendant Dishman

Plaintiff claims that Defendant Dishman issued the laboratory report which formed the

basis of Plaintiff's December 12, 2005, misbehavior report (Ticket # 1).  Compl. at 6.  The

record shows that, at the time the laboratory report was issued, Dishman was a medical doctor

and the Laboratory Director at Alice Hyde Medical Center.  Dkt. No. 35-22.  In his response

papers, Plaintiff elaborates on his claim against Dishman, contending that the blood alcohol level

reported by Dishman is inaccurate because such a reading would have been lethal.  Plaintiff

claims that Dishman conspired with Defendant Dumas, or other Defendants, to charge Plaintiff

with misbehavior, by providing "a laboratory report which therein contained false information

which would of [sic] rendered plaintiff 'dead' if true."  Dkt. No. 40 at 9.  Dishman has submitted

an affidavit stating that "[a]s Laboratory Director [he does] not run any of the lab tests [himself].

The tests are run by technicians employed by the lab."  Dkt. No. 35-21 at 1.  Dishman's affidavit

also states that Plaintiff's 8.4 reading was based upon "milligrams per deciliter [and] is not the

same as the measure used to test blood alcohol content for purposes of driving while impaired or

intoxicated.  That test measures the number of grams of alcohol per 100 grams of the

individual's blood."  Dkt. No. 35-21 at 1-2.  Finally, at his deposition, Plaintiff claimed that he

had a tele-conference with Dishman on December 8, 2005.  Dkt. No. 35-3, Dep. Tr. at 66.  This

statement is contrary to the allegations in Plaintiff's Complaint wherein he stated that the

December 8th tele-conference was with a Dr. Cahill.  Compl. at 6.  Moreover, the record

establishes that at the teleconference on December 8, 2005, Plaintiff spoke to a doctor from the

Erie County Medical Center.  Def. Rule 7.1 Statement at ¶¶ 17-18; Dkt. No. 35-20 at 5, 15.

Dishman's affidavit also establishes that, between 1991 and the date he signed his affidavit, he

was a pathologist employed by Alice Hyde Medical Center in Malone, New York.  Dkt. No. 35-21 at 1.  Clearly the evidence shows that Plaintiff did not speak to Dishman by tele-conference on December 8, 2005.  Moreover, even if the Court were to give weight to Plaintiff's allegation that the tele-conference was with Defendant Dishman, the fact that Dishman spoke to Plaintiff and then directed that Plaintiff stay in the facility hospital overnight for observation does not state a claim of constitutional dimension.  In fact, it does not state any sort of wrongdoing whatsoever.

In sum, no evidence exists on the record to find that Defendant Dishman violated Plaintiff's constitutional rights.  As a result, Defendant Dishman, and all claims against him, are dismissed in their entirety.

## J.     Qualified Immunity

In the alternative, Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's claims that his Fourth Amendment rights were violated when Defendant Dumas collected blood and urine samples from Plaintiff.  In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 129 S. Ct. 808 (2009) (holding that, although "the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory").  The Court may also examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. 194 at 201.  Since the Court has concluded that no Fourth Amendment violation occurred, "there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 35) is

**GRANTED** in its entirety, and Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.  The clerk is

directed to enter judgment and close the case.

Dated: March 24, 2009
       Syracuse, New York


Hon. Glenn T. Suddaby
U.S. District Judge